IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Criminal Action No. 16-cr-00184-RM

UNITED STATES OF AMERICA,

Plaintiff,

v.

GUNTHER GLAUB,

Defendant.

## DEFENDANT'S SENTENCING STATEMENT

Gunther Glaub, by and through his attorneys Siddhartha H. Rathod and Laura B. Wolf of RATHOD | MOHAMEDBHAI LLC, hereby submits his sentencing statement and respectfully asks that Court to impose a sentence of a $500 fine and 2 years of probation. Such a sentence is appropriate given the circumstances of Mr. Glaub's case, and is sufficient but not greater than necessary to satisfy the objectives of 18 U.S.C. § 3553(a) and § 3572(a).

### I.   Background

On January 25, 2017, Mr. Glaub was convicted of five counts of violating the False Claims Act, 18 U.S.C. § 287. [ECF No. 109]. In accordance with the United States Sentencing Guidelines, the following Base Level Offense, Specific Offense Characteristics, and Adjustments should be applied:

1. Base Offense Level, U.S.S.G. § 2B1.1(a)(2):            6
2. Specific Offense Characteristics, U.S.S.G. § 2B1.1(b)(1)(F):   10[1]

---

[1] This level differs from that provided in the Presentence Investigation Report ("PSIR") [ECF No. 123]. An explanation for the difference is provided below.

1

    3.   Total Offense Level:                                                                          16[2]

In the Presentence Investigation Report ("PSIR"), the Probation Officer found that Mr. Glaub was subject to a Specific Offense Characteristic level increase of 16 based upon the Government's characterization that the offense involved an intended loss of $1,680,000. *See* PSIR [ECF No. 123] at ¶ 19; *see also* Government's Sentencing Report [ECF No. 118]. As discussed within Mr. Glaub's Objections to PSI, the intended loss was actually $205,970.02, thereby rendering his Specific Offense Characteristic level increase 10, not 16. *See* Objections to PSI [ECF No. 122] at ¶¶ 1-4, 6. Probation has taken the position that any adjustment to the Specific Offense Characteristic level must be addressed by the Court during sentencing. *See* Addendum to PSIR [ECF No. 124] at A-1. The Government, meanwhile, admits that using a intended loss of $1,680,000 "substantially overstates the seriousness of Defendant's crimes," and it recommends a downward departure of six levels, the same downward departure sought by Mr. Glaub, although for different reasons.[3] *See* Government's Sentencing Report at 2.

Mr. Glaub has no criminal history points, which places him in a criminal history category

---

[2] Because the Probation Office has calculated Mr. Glaub's Specific Offense Characteristic level to be 16, it has calculated his Total Offense Level to be 22. The Government agrees that the Court should consider Mr. Glaub's Total Offense Level to be 16, although it seeks such a calculation through a request for downward departure. *See* Government's Sentencing Report [ECF No. 118] at 2.

[3] Mr. Glaub disagrees that the Government presented enough evidence at trial to establish an intended loss of $1,680,000. As admitted by the Government, Agent Zappe only testified that Mr. Glaub submitted several more substantively identical claims during the same time period, over the objection of defense counsel. *See* Government's Sentencing Report [ECF No. 118] at 2, n.1. In order to satisfy the preponderance of the evidence burden, "the factfinder must evaluate the raw evidence, finding it to be sufficiently reliable and sufficiently probative to demonstrate the truth of the asserted proposition with the requisite degree of certainty." *Concrete Pipe & Prod. of Cal., Inc. v. Constr. Laborers Pension Trust for S. Cal.*, 508 U.S. 602, 622 (1993). Agent Zappe's brief testimony on this matter is not sufficiently probative to demonstrate the truth of the government's asserted position with the requisite degree of certainty. Agent Zappe never testified that Mr. Glaub submitted $1,680,000 worth of requests to the government. Even if he had, one question and answer on the topic is not sufficiently probative of the matter, especially considering that the government did not substantiate the claim with any documentary evidence, nor did it attempt to do so. In turn, Mr. Glaub's intended loss should be found to be no more than $205,970.02.

of I. *See* PSIR [ECF No. 123] at ¶ 28. Based on a total offense level of 16 and a criminal history category of I, the advisory guideline range for Mr. Glaub is 21-27 months imprisonment.[4] In light, however, of the nature of the offense, the fact that no monies were ever paid or even contemplated to be paid by the government, Mr. Glaub's familial obligations, and Mr. Glaub's financial condition, the Government has moved pursuant to 18 U.S.C. § 3553(a) and § 3572(a) for a sentencing reduction to a $500 fine and 4 years of probation with six months to be served in intermittent confinement on weekends. [ECF No. 118]. Probation has recommended a sentencing reduction to a $500 fine, 6 months of incarceration, and 3 years of supervised release. Probation Sentencing Recommendation [ECF No. 121] at 17.[5]

## II.     The Sentencing Guidelines

Under *United States v. Booker* and its progeny, the Supreme Court has held that the Sentencing Guidelines are "effectively advisory." 543 U.S. 220, 245 (2005). "The Guidelines are not only **not mandatory** on sentencing courts; they are also not to be **presumed** reasonable." *Nelson v. United States*, 555 U.S. 350, 352 (2009) (emphasis in original). The Guideline range is but one of several factors that a court may consider in sentencing a defendant. *See Gall v. United States*, 552 U.S. 38, 46-47 (2007); *Kimbrough v. United States*, 552 U.S. 85, 91 (2007).

Pursuant to § 3553(a), the sentencing court shall consider: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for

---

[4] Based on a total offense level of 22 and a criminal history category of I, the advisory guideline range for Mr. Glaub would be 41-51 months. The Government agrees that Mr. Glaub's Total Offense Level should be 16. *See* Government's Sentencing Report at 2; *see also id.* at 1 (recommending a sentencing guideline range of 21-27 months).

[5] As noted in the PSIR Mr. Glaub is not eligible for probation pursuant to the Guidelines – which are completely discretionary and which overstate the severity of Mr. Glaub's unlawful conduct – he is statutorily eligible for a sentence of probation between one and five years. *See* [ECF No. 121 at 17]. Like the Government in its Sentencing Statement, Mr. Glaub respectfully requests a variance from the Guidelines to the statutory provisions in support of his request for a sentence of probation.

the sentence imposed to (a) reflect the seriousness of the offense; (b) afford adequate deterrence; (c) protect the public; and (d) provide the defendant with needed educational training, medical care, or other correctional treatment; (3) the kinds of sentences available; (4) the sentencing range established for the applicable category of offense committed by the applicable category of defendant as set forth in the guidelines; (5) any pertinent policy statement issued by the sentencing commission; (6) the need to avoid sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

When determining whether to impose a fine, the Court should take into consideration the factors above as well as the following: (1) the defendant's income, earning capacity, and financial resources; (2) the burden the fine will impose upon the defendant and those financially dependent upon the defendant; (3) any pecuniary loss inflicted upon others as a result of the offense; (4) whether restitution is ordered and made, including the amount of the restitution; (5) the need to deprive the defendant of illegally obtained gains from the offense; (6) the expected costs to the government of any imprisonment, supervised release, or probation component of the sentence; (7) whether the defendant can pass onto others the expense of the fine; and (8) if the defendant is an organization, the size of the organization and any measures taken to discipline its agents responsible for the offense and to prevent any recurrence thereof. 18 U.S.C. § 3572(a).

In determining the sentence, the sentencing court may not presume that the applicable Guideline provides the correct sentence, but instead it "must make an individualized assessment based on the facts presented." *Rita v. United States*, 551 U.S. 338, 347-48 (2007). "Congress [has] historically permitted district courts 'wide discretion to decide whether the offender should be incarcerated and for how long.'" *Beckles v. United States*, 137 S. Ct. 886, 893 (2017)

(quoting *Mistretta v. United States*, 488 U. S. 361, 363 (1989)). Upon an individualized assessment of the facts in this case, the advisory Guidelines should be rejected by this Court. Mr. Glaub should receive a sentence imposing a $500 fine and 2 years of probation. The Guidelines are not persuasive in the instant case because the Guidelines fail to sufficiently account for the fact that this is Mr. Glaub's first felony conviction, the nature of the offense, the fact that no monies were paid out (nor was there any realistic chance that they would be), Mr. Glaub's financial condition, and Mr. Glaub's significant obligations to his family, including a severely disabled son.

### III. History and Characteristics of Gunther Glaub

Mr. Glaub was born on February 9, 1961 in Fort Stewart, Georgia to parents Darl Dinger and Heidi Agular (née Glaub). PSIR ¶ 33. Mr. Glaub's parents divorced when he was 11 years old, and two years later his mother married Tomas Aguilar. *Id.* ¶¶ 33-34. Although his father also remarried, Mr. Glaub lived with his mother and step-father after the divorce. *Id.* ¶ 34. Both Mr. Glaub's father and step-father had military careers, and Mr. Glaub lived in Germany from infancy until he was approximately eight years old due to his father being stationed there. *Id.* ¶¶ 33-34. In 1969, Mr. Glaub's family moved him and his sister Monique to the Denver area, where he has lived ever since. *Id.* ¶ 35. Mr. Glaub enjoys a close relationship with both his mother and father. *Id.* ¶ 34.

Mr. Glaub married Amy Glaub (née Divine) in Denver, Colorado in 1986. *Id.* ¶ 36. The couple have had nine children together. *Id.* Their children are as follows:

| Name | Age | Occupation |
| --- | --- | --- |
| Dieter Aguilar-Glaub | 30 | Grocery store employee |
| Gunther Barak Aguilar-Glaub | 28 | Construction worker |

5

| Porsche Davis | 26 | Homemaker |
| --- | --- | --- |
| Estee Glaub | 23 | Restaurant server |
| Espirit Bennett | 22 | Teaching assistant |
| Aeriahna Glaub | 20 | Retail employee |
| Enden Glaub | 19 | Restaurant employee |
| Covert Glaub | 16 | Student |
| Malachi Glaub | 14 | Student |

*Id.* Mr. Glaub's son Malachi has a severe form of Down Syndrome and is difficult to care for him due to his age and size, as well as the severity of his mental and physical disability. *Id.* ¶ 37; *see also* Letter from Gunther Barak Aguilar-Glaub [ECF No. 124-2] at 2; Letter from Porsche Davis [ECF No. 124-4]; **Ex. 1**, *2017.04.11 Lurie Letter* (describing the severity of Malachi's symptoms and the need for Mr. Glaub in Malachi's day-to-day life). For example, when Malachi gets upset he can become aggressive, and due to his near-adult size, it can be incredibly difficult for his mother to handle him on her own. PSIR ¶ 37; *see also* Letter from Gunther Barak Aguilar-Glaub at 2. Malachi has a special bond with his father, who is able to make him laugh while also calming him down when necessary. *See* Letter from Gunther Barak Aguilar-Glaub at 2; Letter from Porsche Davis; Letter from Estee Glaub [ECF No. 124-3]. Malachi will not even go to school without Mr. Glaub present. *See* PSIR ¶ 37. For example, Mr. Glaub routinely uses his break time from work to return home and place Malachi on the school bus. As such, it would be incredibly traumatic for Malachi if his father were cut out of his life. *See* Letter from Estee Glaub; *see also* Letter from Stormie Rock [ECF No. 124-5] (describing his belief that "Gunther is a vital part of Malachi's success in society"). Beyond his nine children, Mr. Glaub has five

6

grandchildren whom he loves dearly. *See* Letter from Porsche Davis. Mr. Glaub has lived with his family in Castle Rock, Colorado for more than a decade. PSIR ¶ 35. They have stayed strong together through incredibly tough times, including the loss of both parents' jobs and their family home. *See* Letter from Aeriahna Glaub [ECF No. 124-1] at 4.

Mr. Glaub graduated from Heritage High School in Littleton, Colorado in 1979. PSIR ¶ 45. Mr. Glaub attended one year at Arapahoe Community College in Denver, Colorado, but he left before completing a degree program. *Id.* Mr. Glaub also attended Lincoln Technical College for a short time in 2012, but he left before obtaining a certificate in automobile repair. *Id.*

Mr. Glaub is the sole breadwinner for his family and he is seen as the glue that holds his family together. *See* Letter from Amy Glaub [ECF No. 124-6]; Letter from Aeriahna Glaub at 4-5; Letter from Porsche Davis. From 1992 through 2009, he worked full-time as a driver for UPS earning $28 per hour. PSIR ¶ 48. Mr. Glaub was forced to resign due to back problems, and at that time he became a full-time homemaker, taking care of his children, including his severely disabled son Malachi. *Id.* Mr. Glaub returned to the workforce in April 2013, but he found that he was unable to make an amount remotely close to the wages he had previously been earning. Between April 2013 and September 2016, Mr. Glaub worked for TPM Staffing doing general labor with varying wages depending on the assignment. *Id.* ¶ 47. Mr. Glaub also began working at Sprouts in February 2014, where he earned $13 per hour as its produce lead up until his arrest for the present offense. *Id.* ¶ 48. Since September 2016, Mr. Glaub has been employed as a stocker at a King Soopers in Castle Rock, Colorado. *Id.* ¶ 46. Mr. Glaub earns $11 per hour and currently works approximately 40 hours per week. *Id.* In the last several weeks, Mr. Glaub also began a second job working for Nabisco, where he works approximately 6 to 10 hours per week

making $14 per hour. *Id.*

Despite the amount of hours he works, when taking into account his family's expenses Mr. Glaub's monthly cash flow is $13 per month. *Id.* at 11. His total assets are valued at $2,330, only $30 of which is liquid. *Id.* Mr. Glaub currently owes approximately $2,420 in unpaid debts. *Id.* ¶ 51.

## IV. Nature and Circumstances of the Offense

In 2010, Mr. Glaub attended a meeting where he believed he would learn how to save his home from foreclosure during the housing crisis. In approximately 2012, Mr. Glaub attended a second meeting to learn how to extinguish some of his debts. The government found these meetings suspicious because they appeared to be organized by individuals who associated themselves with the Sovereign Citizens movement. Mr. Glaub was interviewed in connection with each of these meetings even though the Government has admitted that Mr. Glaub had every right to attend these meetings under the First Amendment.

In early 2012, and based on his understanding of the law, Mr. Glaub sent to the United States Department of Agriculture five pieces of mail in which a copy of a debt or an invoice is attached, and which states on the cover letter "Thank you for paying this debt." *See* Government's Trial Exhibits 1-5; *see also* Letter from Estee Glaub (explaining that her father would not have taken these actions if he had understood they could in any way be seen as illegal); Letter from Amy Glaub (describing Mr. Glaub as "a man that tries to do what is right, a man that would never intentionally, knowingly, purposefully try to defraud, steal or harm anyone"). None of these debts or invoices were ever paid, and testimony at trial revealed that while these letters appeared odd, there was no genuine concern that the debts would have been inadvertently paid out. These letters were mailed in 2012, and since that time there is no

evidence that Mr. Glaub has sent any additional letters of this nature to any government agency or that he has engaged in any other unlawful behavior.

### V. The Need for the Sentence Imposed

Under § 3553(a)(2), the Court shall consider the need for the sentence imposed "(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; [and] (C) to protect the public from further crimes of the defendant . . . ."

#### A. Need for Just Punishment in Light of the Seriousness of the Offense

The Parties appear to agree that in the grand scheme of False Claims Act prosecutions, the present offense is amongst the least serious. Mr. Glaub sent letters to government officials asking the government to pay some of his debts as well as invoices for vehicles he wished to purchase. Mr. Glaub did not claim to have a right to these funds under an existing government program, nor did he act duplicitously in making his requests. According to the government, the only thing criminal about sending these letters was that Mr. Glaub sent them "knowing that the bill and debt was in fact owed by himself." *See* Indictment [ECF No. 1] at 1. The government paid out no monies to Mr. Glaub or to his creditors, with the only alleged harm concerning the lost time of two car salesmen, both of whom testified that Mr. Glaub was not their first customer not to have ultimately purchased a car from them and that spending time with potential buyers who do not have adequate funding was a routine occurrence. Furthermore, there is no evidence that Mr. Glaub has sent any additional letters or engaged in any similar behavior in the last five years. At the time he sent these letters, Mr. Glaub was unemployed and acting as a full-time homemaker, taking care of his family without any resources. Mr. Glaub's conduct reflects that of a desperate and naïve father and husband, not a criminal mastermind.

Beyond this conduct, Mr. Glaub has been convicted of only one crime: misdemeanor trespass. Insofar as the Government asks the Court to look at Mr. Glaub's conduct with respect to his Douglas County property taxes, it is worth noting that Ms. Oien testified at trial that the property taxes had in fact been paid. Moreover, this conduct pre-dated Mr. Glaub's offenses at issue in this case, and Mr. Glaub has lived the last five years of his life without engaging in any similar behavior. Certainly, these are not the actions of an "unrepentant fraudster," [ECF No. 118 at 3], and instead the last five years more than adequately demonstrate Mr. Glaub's commitment to live a law-abiding life. It is particularly notable that Mr. Glaub did not wait to be arrested to begin complying with the law, and instead lived a law-abiding life for four years before the government chose to arrest him on the eve of the statute of limitations running.

**B.    Need for Deterrence**

Under § 3553(a), the Court should consider whether the sentence imposed has a sufficient deterrent effect. "Deterrence has both a specific and a general function. Specific deterrence dissuades the particular defendant from engaging in criminal conduct. In contrast, general deterrence discourages others from engaging in similar criminal conduct." *United States v. Cole*, 622 F. Supp. 2d 632, 638 (N.D. Ohio 2008).

No matter the sentence the Court imposes, Mr. Glaub has already been deterred from committing future crimes. Since the conduct that led to the Indictment, Mr. Glaub has been a stable, contributing member of society. He enjoys close relationships with his mother and father, as well as with his wife, nine children, and five grandchildren. His family provides a support network that motivates him to go to work each day and to continue leading a law-abiding life. Mr. Glaub has been adequately deterred from any future criminal conduct with the fear of leaving his family without his financial and emotional support, especially for his wife and

Malachi. Mr. Glaub has already experienced the detrimental effect of unlawful activity through the loss of his job at Sprouts and his time away from his family spent in custody. A sentence of imprisonment will serve neither Mr. Glaub nor society.

With regard to general deterrence, research has consistently shown that while the certainty of being caught and punished has a deterrent effect, "increases in severity of punishments do not yield significant (if any) marginal deterrent effects." Michael Tonry, *Purposes and Functions of Sentencing*, 34 Crime & Just. 1, 28 (2006). "There is generally no significant association between perceptions of punishment levels and actual levels . . . implying that increases in punishment levels do not routinely reduce crime through general deterrence mechanisms." Gary Kleck, et al., *The Missing Link in General Deterrence Theory*, 43 Criminology 623 (2005). As one court has stated, a defendant's sentence "should not be longer simply to satisfy an objective that, while laudable, is not being achieved according to any empirical or other evidence in this case or, for that matter, empirical evidence in any other case or source that I am aware of." *United States v. Beiermann*, 599 F. Supp. 2d 1087, 1104 (N.D. Iowa 2009). Thus, sentencing Mr. Glaub to a term of imprisonment instead of probation will not serve any general deterrence aims.

### C. Need to Protect the Public Through Incarceration

Mr. Glaub is a first time felony offender with a criminal history score of zero. First-time offenders like Mr. Glaub have a much lower rate of recidivism than those who have one or more criminal history points. *See* U.S. Sent'g Comm'n, *Recidivism and the First Offender* (May 2004).[6] The rate of recidivism for first-time offenders (including reconviction, re-arrest, or

---

[6] This report can be found here: http://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf.

revocation) is only 11.7%.[7] *Id.* at 13-14. By comparison, the rate of recidivism for offenders with one criminal history point is 22.6% and the rate of recidivism for offenders with two or more criminal history points is 36.5%. *Id.* Thus, this Court should place great weight on Mr. Glaub's first-time offender status. *See United States v. Darway*, 255 F. App'x 68, 73 (6th Cir. Nov. 9, 2007) (upholding downward variance based on defendant's first-time offender status); *United States v. Cabrera*, 567 F. Supp. 2d 271, 279 (D. Mass. 2008) (granting variance because defendants "with zero criminal history points are less likely to recidivate than all other offenders"). Furthermore, considering the non-violent nature of the crime as well as the fact that Mr. Glaub has not engaged in any similar conduct over the last five years, there is no need to protect the public through the mechanism incarceration.

## VI. Conclusion

Mr. Glaub will accept as just any sentence that this Court imposes. Nevertheless, given his first-time offender status, the nature of the offense, the fact that no monies were ever paid by the government, and Mr. Glaub's familial obligations, Mr. Glaub submits that there exists no good reason to sentence him to incarceration, let alone the advisory sentencing range of either 21-27 months or 41-51 months.[8] Similarly, given his financial condition, Mr. Glaub submits that the Court should not impose on him a fine of $250,000, the statutory maximum. A $500 fine as well as a sentence of 2 years of probation will fully satisfy the objectives of § 3553(a) and § 3572(a).

---

[7] The rate of reconviction alone is much lower. Offenders with zero criminal history points have a reconviction rate of only 3.5%. *Id.*

[8] The former range is based on a Total Offense Level of 16, while the latter is based off of a Total Offense Level of 22, both with Criminal History Category of I.

Respectfully submitted this 5th day of May, 2017.

                                                                                                                                                 RATHOD | MOHAMEDBHAI LLC

                                                                                                       s/ Siddhartha H. Rathod
Siddhartha H. Rathod
Laura B. Wolf
2701 Lawrence Street, Suite 100
Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
sr@rmlawyers.com
lw@rmlawyers.com

*Counsel for Defendant*

## CERTIFICATE OF SERVICE (CM/ECF)

I hereby certify that on May 5, 2017, I electronically filed the foregoing **DEFENDANT'S SENTENCING STATEMENT** with the Clerk of the Court using the CM/ECF system and/or electronic mail, which will send electronic notification to all the parties.

*s/ Siddhartha H. Rathod*
Siddhartha H. Rathod